The GREAT ATLANTIC & PACIFIC TEA
CO., Inc., a corporation, National Food
Stores, Inc., a corporation and the Kro-
ger Company, a corporation

v.

AMALGAMATED MEAT CUTTERS AND
BUTCHERS WORKMEN OF NORTH
AMERICA, LOCAL UNION NO. 88,
AFL-CIO, and Amalgamated Meat Cut-
ters & Butcher Workmen of North
America.

No. 66 C 159(3).

United States District Court
E. D. Missouri, E. D.
March 14, 1968.

Walter M. Clark, Armstrong, Teasdale, Kramer & Vaughan, St. Louis, Mo., for plaintiffs.

Harry H. Craig and M. A. Shenker, Wiley, Craig, Armbruster & Wilburn, St. Louis, Mo., for defendant, Amalgamated Meat Cutters, etc. Local Union 88, AFL–CIO.

Lester Asher, Chicago, Ill., for defendant, Amalgamated Meat Cutters & Butcher Workmen.

## MEMORANDUM OPINION AND ORDER

REGAN, District Judge.

Plaintiffs, each the operator of a chain of retail food stores or supermarkets in the St. Louis trade area, are parties to separate collective bargaining agreements with Local Union No. 88 (Local Union) an affiliate of defendant Amalgamated Meat Cutters and Butcher Workmen of North America (AFL–CIO), (International Union), each such contract containing, among other provisions, Article 5(b), the requirements of which have given rise to this litigation.

Each contract is for a two year term, expiring midnight of January 28, 1967, but to continue from year to year from the expiration date unless either party serves notice in writing sixty days before said date for termination of or for changes in the agreement. The parties have not advised us if any such notice has been served in this case (the action having been brought prior to the expiration date). Previous contracts between the parties, dating back to 1950, also contained a provision identical to Article 5(b) which reads as follows:

"All fresh or frozen meat, sausage, fish, seafood, poultry, smoked meat and rabbits shall be handled by the Meat Department employees. All fresh or frozen fish and poultry and all fresh or frozen meat, namely pork, beef, veal, lamb, mutton and also all sausages, smoked meat and rabbits and ground meat, must be cut, weighed, sliced and wrapped on the premises; except however, the employees covered by this Agreement will handle those items that were prepared and packed off the premises prior to October 2, 1950. It is expressly understood that to do otherwise will be a violation of this Agreement."

The Amended Complaint alleges that in the course of negotiating each of the contracts (beginning with the 1950 agreement) either Local Union or In-

ternational Union, or both, have informed plaintfifs that Local 88 would refuse to enter into an agreement which did not contain Article 5(b) and would cause a strike if plaintiffs refused to include such provision in the contract, and further alleges that each plaintiff acquiesced therein only because of such economic pressure and coercion.

The Amended Complaint is in two counts. The first seeks a declaratory judgment that Article 5(b) of the contracts is in violation of Section 1 of the Sherman Act, Section 1, 15 U.S.C. Count II, brought as an alternative to Count I, alleges that by "coercing" plaintiffs to include Article 5(b) in the collective bargaining agreement, defendants have violated Section 303 of the Labor Management Relations Act, 29 U.S.C. Section 187, to plaintiffs' damage. Both defendants have moved to dismiss the Amended Complaint on the basic contention that neither count states a claim upon which relief can be granted.

■ For the purpose of the motions to dismiss, the facts well pleaded in the Amended Complaint have been taken as true. For reasons stated infra, we hold that the motions to dismiss are well taken as to both counts.

We first consider the sufficiency of the Amended Complaint as it relates solely to the International Union. Significantly, there is no allegation that International Union was a party to or signatory of the contract. The sole basis for the joinder of International Union are the following facts. In May, 1963 (prior to the effective date of the contracts under which plaintiffs are presently operating and while prior contracts were effective), International Union removed the officers of Local Union and from then until the latter part of 1964 operated Local Union under trusteeship. During the period of trusteeship, International Union had full control of the operation of Local Union in "dealings with plaintiffs" under the earlier collective bargaining agreements. After the trusteeship was terminated, International Union "continued to take an active part in contract negotiations between plaintiffs and Local 88," participated in negotiations resulting in the present labor agreements between plaintiffs and Local Union, and exerted economic pressure on plaintiffs for inclusion of Article 5(b) in the agreements, by informing plaintiffs that Local Union would refuse to execute an agreement without such provision and would cause its employees to go on strike if plaintiffs should refuse to include the provision in the contracts being negotiated.

■ We hold that the foregoing allegations, in the context of the Amended Complaint considered as a whole, are insufficient to afford a basis for a claim against International Union. On the facts well pleaded, we fail to see any *legal* interest on the part of International Union in the validity vel non of Article 5(b). The declaratory judgment sought by plaintiffs in Count I does not directly affect International Union because it is not a party to the contract, and in fact has never sought (at least successfully) to obtain its inclusion in contracts between employers and others of International's affiliated unions elsewhere in the United States. Only Local Union has a direct legal interest in the declaration sought and it alone is the contracting party.

The circumstances under which International Union may impose a trusteeship upon Local Union, as well as the precise relationship between International and Local, are nowhere set forth in the Amended Complaint. It is obvious that during the period of trusteeship, International Union would necessarily have had control of the operation of Local Union and that in so doing it would "deal" with plaintiffs under the collective bargaining agreements then in existence. There is no allegation that any specific conduct on the part of International Union during the trusteeship, even in relation to Article 5(b), was legally

detrimental to plaintiffs. In fact, there is no allegation concerning any *specific* manner in which Article 5(b) was enforced during the period of trusteeship. So, too, International Union's alleged participation in negotiations resulting in the current agreements states no facts which would indicate any impropriety on International Union's part. It is clearly to be inferred that after termination of the trusteeship, International Union no longer had any *control* over Local Union, or had any power whatsoever to cause a strike by members of Local Union. Hence, absent a showing that International Union was in effective control of Local Union at the time of the "negotiations", any threat on its part to cause the members of Local Union to strike could not constitute any economic pressure or coercion. For these reasons, additional to those also applicable to Local Union, we are of the opinion that plaintiffs have failed to state a claim against International Union.

We next turn to the claims asserted against Local Union. First as to Count I, which seeks a declaratory judgment that Article 5(b) is violative of Section 1 of the Sherman Act. Plaintiffs allege that they "fear" that the effect of the inclusion of Article 5(b) in the collective bargaining agreement is a restraint of interstate trade and commerce, in that thereby plaintiffs (as well as other store and supermarket operators who have entered into similar contracts), are allegedly prohibited and prevented from offering for sale to the general public numerous prepackaged meats and meat products, including many advertised "brand name" products. It is further alleged that there are meat departments of retail food stores in supermarkets immediately outside the St. Louis area which (presumably because they are not subject to any contractual restrictions under Article 5(b)) are not prevented from selling items which that Article allegedly precludes plaintiffs from selling, and thereby plaintiffs are prevented from engaging in fair competition with such stores and supermarkets. Additionally, even in the St. Louis area, retail food stores and food markets which have no contractual relations with Local Union are able to sell such items, so that plaintiffs are unable to engage in open and fair competition with such stores and supermarkets. It is further alleged that Article 5(b) "and the restraints and coercive actions of defendants in enforcing such provision" deprives the general public in the St. Louis area of the opportunity of purchasing prepackaged meat and meat products.

There are numerous conclusionary allegations in the Amended Complaint, e. g., that the actions of defendants in "coercing" plaintiffs to enter into contractual agreements containing Article 5 (b) "were not committed by defendants pursuant to legitimate labor objectives". The latter conclusion is evidently based upon the allegation that those stores outside the St. Louis area which do not have a restraint such as that imposed by Article 5(b) are not staffed by fewer employees because of handling meat and meat products prepackaged off the premises. It is further alleged that certain meats and meat products affected by the prohibitions of Article 5(b) are items which have never been "cut, weighed, sliced and wrapped on the premises by employees of the plaintiffs and many of such products cannot be so prepared on the premises because of practical and economic considerations." In this connection it is further alleged that enforcement of Article 5(b) prevents plaintiffs from selling to the general public a number of "brand name" meats and meat products "many of which have been developed by meat processors and manufacturers in the food industry since 1950, and which cannot feasibly be prepared on plaintiffs' premises." Plaintiffs also make the conclusionary allegation that if they are allowed to sell prepackaged meat and meat products now allegedly prohibited by Article 5(b), this "would not

result in a manpower reduction in plaintiffs' meat departments, but instead would affirmatively allow the general public a wider selection of 'brand name' meat products and a more diverse variety of types of meat and meat products."

Two further allegations are made, one to the effect that "enforcement" of Article 5(b), whatever that means, has resulted in further product control by defendants in that defendants have "arbitrarily and selectively allowed certain of plaintiffs' retail food stores or supermarkets in the St. Louis area to sell certain pre-packaged meat and meat products which technically plaintiffs were forbidden to sell under ARTICLE 5(b)." Finally, the statement is made that under past contracts containing an identical Article 5(b) provision, "a certain Local 88 official actively encouraged plaintiffs to overlook ARTICLE 5(b) in regard to purchase of meat and meat products from dealers and processors toward which Local 88 was favorably inclined." [1] These conclusionary allegations afford no information of practical value.

Based essentially on the foregoing allegations, a declaration is sought that Article 5(b) is violative of Section 1 of the Sherman Act and is null and void and of no force and effect.

There is an entire want of any allegation, and in the briefs and oral argument no claim is made, that the inclusion of Article 5(b) in the contract has been insisted upon by Local Union for any reason other than the effectuation of its own labor union policies. Clearly, there is no charge that Local Union acted either in combination with or at the behest of any nonlabor group. In essence, what plaintiffs really claim is that defendants are mistaken in their belief that Article 5(b) serves a legitimate union self-interest.

Plaintiffs have not cited us to any case which supports their contention that a provision such as Article 5(b), in and of itself, is violative of the Sherman Act or that it could reasonably be so held. The only two cases discussed at length on this issue are United Mine Workers of America v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626, and Local Union No. 189, Amalgamated Meat Cutters, and Butcher Workmen of North America, AFL–CIO v. Jewel Tea Co., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640. We find no support for plaintiffs' contention in either of these cases.

In *Pennington,* there was an agreement between the union and a group of large employers to secure uniform labor standards throughout the industry for the purpose and with the effect of discouraging smaller operators and preempting the market for the large operators. The Supreme Court held that *such an agreement* was not exempt from the antitrust laws. The basic holding of *Pennington* was that although a union may make wage agreements with a multiemployer bargaining unit and may, in pursuance of its own self-interest, seek to obtain the same terms from other employers, the union forfeits its antitrust exemption when it *agrees* with one group of employers to force a certain wage scale on another bargaining group, and *thus* engages in unfair competition. Stated otherwise, what was there held was that a union may not combine with an employer or employer group for the purpose of imposing certain standards on another employer or employer group. The present case, however, charges no conspiracy or combination whatsoever, the inclusion of Article 5(b) resulting only from the unilateral action of the Union in what it mistakenly (on plaintiffs' theory) deemed to be its own self-interest.

*Jewel Tea* involved a restriction in a collective bargaining agreement, which plaintiff charged was the result of a conspiracy between the defendant unions

---

[1]. Other than the foregoing there is no allegation relating to any *specific actions* of defendants in *enforcing* Article 5(b), as distinguished from insisting on its inclusion in the contract.

and an association of retail food stores to restrain competition in the retail meat markets by limiting the marketing hours for the sale of fresh meat through a clause in the bargaining agreement between Jewel Tea and the unions.

Six of the Justices agreed with the district court's finding that the record was devoid of any evidence to support the existence of the alleged conspiracy. In sustaining the trial court's further finding that the limitation on marketing hours had been imposed to serve the unions' own interests respecting conditions of employment, and hence was within the labor exemption of the Sherman Act established by Hunt v. Crumboch, 325 U.S. 821, 65 S.Ct. 1545, 89 L.Ed. 1954, United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788, and United States v. American Federation of Musicians, 318 U.S. 741, 63 S.Ct. 665, 87 L.Ed. 1120, the majority was equally divided in its reasoning. Mr. Justice White, with whom the Chief Justice and Mr. Justice Brennan concurred, relied on the trial court's finding that the butchers' workload would be adversely affected by the removal of the limitation on marketing hours. On the other hand, Mr. Justice Goldberg, joined by Mr. Justice Harlan and Mr. Justice Stewart, was of the opinion that irrespective of whether self-service markets could operate aftter 6 P.M. without butchers and without increasing the work of their butchers at other times, the unions nevertheless had a legitimate interest in insisting upon the limitation of marketing hours.

Plaintiffs stress the fact that the district court's finding in *Jewel Tea* concerning the propriety of the unions' objectives was based upon facts found from the trial evidence. On this premise, they argue that having alleged as a "fact" that the invalidation of Article 5 (b) would not result in any reduction of manpower, it follows that whether that Article is a legitimate subject of union self-interest may be determined only after a trial of this issue. They quote the following from the opinion of Mr. Justice White:

> "If it were true that self-service markets could actually operate without butchers, at least for a few hours after 6 p. m., that no encroachment on butchers' work would result and that the workload of butchers during normal working hours would not be substantially increased, Jewel's position would have considerable merit. For then the obvious restraint on the product market—the exclusion of self service stores from the evening market for meat—would stand alone, unmitigated and unjustified by the vital interests of the union butchers which are relied upon in this case."

Plaintiffs, however, stop short of the significant language which immediately follows the quoted portion, namely:

> "*In such event* the limitation imposed by the unions might well be reduced to nothing but an effort by the unions *to protect one group of employers from competition by another,* which is conduct that is not exempt from the Sherman Act."

In the context of that case, namely a charge by plaintiff that the limitation of marketing hours resulted from a conspiracy to protect other employers from competition by Jewel Tea, the restraint on the product market, if it stood alone *wholly* unjustified by the vital interest of the union butchers, "*might* well" demonstrate that the unions' actual motive was to aid one group of employers in competing with others. Hence, in the view of Mr. Justice White, the limitation of marketing hours "might well" require some proof as to whether such a limitation is a proper matter of union interest, as distinguished from a limitation of hours during which employees shall be required to work—a matter which *on its face* would necessarily disclose the legitimate concern of the Union (381 U.S., l. c. 691, 85 S.Ct. 1596).

Assuming that the legitimacy of the limitation of marketing hours provision

in *Jewel Tea* was a fact issue, to be determined solely on the basis of evidence, as Mr. Justice White believed, it does not follow that the propriety of Article 5(b) also became a fact issue simply because of the conclusionary allegations in the Amended Complaint to the effect that Local Union has no legitimate work preservation motive which is served thereby.

In *Jewel Tea*, the employer's contention was that the actual motive of the Unions was to aid and abet a group of other employers in competing with Jewel Tea. In the instant case, however, plaintiffs do not enlighten us as to what Local Union's motive is or could be if it is not a work preservation one.

As we read Article 5(b), it is not comparable to a restriction of marketing hours, in that on its face it does have a demonstrable work preservation motive, even though conceivably in some factual situations a manpower reduction might not result. Clearly, the invalidation of Article 5(b) would mean that plaintiffs would have the power to completely eliminate, to the detriment of the union employees, all or any portion of work in their meat departments involving the cutting, weighing, slicing and packaging of *all* meat and meat products, by having such work done off their premises. Moreover, it is entirely possible, if not probable, that customers purchasing a meat product packaged off the premises, would otherwise have purchased one cut, sliced, weighed and packaged on the premises, a possibility which could conceivably result in a manpower reduction. We fail to see how this speculative issue could be definitively resolved by evidence. And on the other side of the coin is the possibility that if plaintiffs required their present staff to handle the products pre-packaged off the premises in addition to those items now handled in the meat departments, the employees' workload would be increased.

On its face, the purpose of Article 5(b) is not to prevent plaintiffs from dealing in any specific products, nor is it directed against any other *specific* employer, but has as its purpose the preservation of the kind of work theretofore performed by the covered employees. Insofar as Count I is concerned, we hold that Article 5(b) is not violative of Section 1 of the Sherman Act, even though its enforcement may incidentally result in preventing plaintiffs from selling certain products which are cut, weighed, sliced and packaged by others off plaintiffs' premises.

In the language of Mr. Justice White, 381 U.S., l. c. 689–690, 85 S.Ct. 1602, "the issue in this case is whether [Article 5(b)] is so intimately *related* to wages, hours and working conditions that the unions' successful attempt to obtain that provision through bona fide, arm's-length bargaining in pursuit of their own labor union policies, and not at the behest of or in combination with non-labor groups, falls within the protection of the national labor policy and is therefore exempt from the Sherman Act. We think that it is."

Somewhat different considerations are applicable to Count II, which is an alternative claim based on Section 303 of the Labor Management Relations Act, Section 187, 29 U.S.C. That statute provides a remedy for an injury to one's business or property by reason of a violation by any labor organization of Section 8(b) (4) of the Act, Section 158(b) (4), 29 U.S.C.

Section 158(b) (4) declares it to be an unfair labor practice for a labor organization to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, or otherwise handle goods or commodities, or to threaten, coerce or restrain any person engaged in commerce or in an industry affecting commerce, where an object thereof is forcing or requiring any employer to enter into any agreement which is pro-

hibited by Section 8(e), or forcing or requiring any person to cease using, selling, handling or otherwise dealing in the products of any other dealer, processor or manufacturer or to cease doing business with any other person. Section 8(e), Section 158(e) 29 U.S.C., declares void and unenforcible agreements whereby an employer refrains or agrees to refrain from handling, using, selling or otherwise dealing in any of the products of any other employer.

Plaintiffs take the position that by insisting upon the inclusion of Article 5 (b) in the contract between the parties under the threat of a strike, defendants have violated the foregoing statute. Their theory is that Article 5(b) prevents them from "handling, using, selling * * * or otherwise dealing in" numerous meats and meat products prepared by a number of meat packers and processors, and thus is proscribed by the literal language of Section 8(e).[2] Plaintiffs urge that Article 5(b) "clearly is aimed at third parties," on their assumption that "defendants' actions cannot be tied to a work preservation motive or any other legitimate labor objective or interest." We have held a similar contention lacking in merit as to Count I.

We have carefully examined Count II of the Amended Complaint for the purpose of ascertaining what, if any, allegations plaintiffs have made to support their argument that Article 5(b) "clearly is aimed at third parties," and have found nothing which justifies plaintiffs' theory. We note that among the allegations is one to the effect that no affiliate local union of International Union, throughout the United States, other than defendant Local Union, has entered into a labor union contract containing a provision such as Article 5(b). What this demonstrates, other than that such other affiliated unions either do not have the bargaining strength of defendant Local Union or that they are strong enough to preserve their traditional work without such a provision, we are not informed.

It is, of course, alleged in the Amended Complaint (to support the contention that the inclusion of Article 5(b) "cannot be tied to any legitimate union interest of the union or its employees") that many prepackaged meats and meat products which have been developed by various manufacturers and processors since 1950 were never cut, weighed, sliced and wrapped on the premises by plaintiffs' meat department employees, and that many of such products cannot feasibly be so handled. It may well be true, as plaintiffs urge in their argument, that included in the prepackaged products affected by Article 5(b) are some new types which would not specifically replace products presently prepared and handled by members of Local Union. Of course, merely because certain products are new types does not mean that in the event such meat products are not available at plaintiffs' stores, the customer would not otherwise purchase in lieu thereof one of the other meat products prepared and packaged on the premises by members of Local Union, thereby preserving for the employees work which might otherwise be lost to them. As we have noted, Article 5(b) is directed to *categories*, rather than to any

2. The Supreme Court has questioned whether Section 8(e) actually is applicable to contractual provisions such as Article 5(b). See National Woodwork Manufacturers Association v. National Labor Relations Board, 386 U.S. 612, 619, footnote 4, 87 S.Ct. 1250, 1255, 18 L.Ed. 2d 357:

"The statutory language of § 8(e) is far from unambiguous. It prohibits agreements to 'cease * * * from handling * * * any of the products of any other employer * * *.' (Emphasis supplied.) Since both the product and its source are mentioned, the provision might be read not to prohibit an agreement relating solely to the nature of the product itself, such as a work-preservation agreement, but only to prohibit one arising from an objection to the other employers or a definable group of employers who are the source of the product, for example, their nonunion status."

*specifically designated* product. Actually, what plaintiffs are contending is that the language therein employed, if literally construed, is broader than necessary as a work preservation clause.

■ Both parties rely on National Woodwork Manufacturers Association v. National Labor Relations Board, 386 U. S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357, and Houston Insulation Contractors Assn. v. National Labor Relations Board, 386 U.S. 664, 87 S.Ct. 1278, 18 L.Ed.2d 389. In these cases, the Supreme Court rejected a literal application of both Section 8(b) (4) and Section 8(e). *National Woodwork* stands for the proposition that Section 8(b) (4) was not designed to prohibit primary agreements and primary activity directed to work preservation, but rather to prohibit *secondary* objectives, i. e., the exertion of pressure on a neutral employer, and this is true even though the primary activity has an impact on neutral employers. It holds that "collective activity by employees of the primary employer, the object of which is to affect the labor policies of *that primary employer,* and not engaged in for its effect elsewhere, is protected primary activity. Houston, 386 U.S., l. c. 668, 87 S.Ct. 1281.

*Houston* extended the foregoing construction of the statute by holding that a boycott by employees who had no dispute of their own with the primary employer did not thereby become prohibited secondary activity, where its object was to support their fellow employees and was not engaged in for its effect elsewhere.

In insisting that a hearing on the merits is required, plaintiffs rely on the following statement in *National Woodwork* (386 U.S., l. c. 644, 87 S.Ct. 1268):

"The determination whether the 'will not handle' sentence of Rule 17 and its enforcement violated § 8(e) and § 8 (b) (4) (B) cannot be made without an *inquiry* into whether, under all the surrounding circumstances, the Union's objective was preservation of work for

Frouge's employees, or *whether the agreements and boycott were tactically calculated to satisfy union objectives elsewhere.* Were the *latter* the case, Frouge, the boycotting employer, would be a neutral bystander, and the agreement or boycott would, within the intent of Congress, become secondary."

■ We do not read this language, requiring an "inquiry", to mean that an evidentiary hearing is necessary in every case simply because the complaining party makes the conclusionary claim that the provision objected to is not tied to a legitimate labor objective or interest. Plaintiffs here make no allegation whatsoever which would support a finding that the agreement (and the boycott, if any) *"were tactically calculated to satisfy union objectives elsewhere."* The Supreme Court held in *National Woodwork* that Congress meant to protect the employer *only* from union pressures designed to involve him in disputes *not* his own.

Citing Fibreboard Paper Products Corp. v. National Labor Relations Board, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233, the Court noted that work preservation clauses are permissible, and indeed, bargaining on the subject is mandatory, "concerning as it does 'terms and conditions of employment.'" 386 U.S., l. c. 642, 87 S.Ct. 1267. *Fibreboard* involved contracting out of work. *National Woodwork* held that the principle of *Fibreboard* is not limited to contracting out of work which the contractor is to do on the premises. On its face, a prime purpose of Article 5(b) is to guard against contracting out of work traditionally done by members of Local Union on the premises, and assure that such work is not in fact done off the premises to the detriment of Local Union members.

In the concurring memorandum of Mr. Justice Harlan, he noted that "Union members traditionally had performed the task of fitting doors on the jobsite, and there is no evidence of any motive for this contract provision and its companion

boycott other than the preservation of *that* work. This, then, is not a case of a union seeking to restrict by contract or boycott an employer with respect to the products he uses, *for the purpose of acquiring for its members work that had not previously been theirs."*

So, too, in the present case plaintiffs do not question that Local Union members traditionally had performed the task of cutting, weighing, slicing and wrapping on the premises fresh, frozen and smoked meat and meat products, and there is not the slightest intimation in the Amended Complaint that the Union has for its purpose the acquisition for its members of work that had not previously been theirs.

Obviously, Article 5(b) is not designed to acquire new job tasks, particularly in view of plaintiffs' allegations that as to the products in question the work *cannot* be done on the premises. Here, as in *National Woodwork*, the arrangement appears to be designed "to fend against possible adverse effect upon workers arising by changing technology," in addition to preserving for the union members the traditional work they had performed in the past.

█ The sum and substance of plaintiffs' allegations amount to no more than the claim that the union is mistaken in believing that Article 5(b) will aid it in satisfying its objectives in relation to preserving their employee members' work with plaintiffs. In *National Woodwork* it was said: "The touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer *vis-a-vis* his own employees." And as we have pointed out, there is nothing in the Amended Complaint charging or indicating that Article 5(b) is *addressed* to any objective other than the labor relations of plaintiffs vis-a-vis their employees who are members of Local Union.

*National Woodwork* involved charges of unfair labor practices filed by the National Labor Relations Board at the in-

stance of third party complainants against whom the union's activity was allegedly directed. Here, the primary employers have filed an action for damages in which a claim for relief must be stated. Hence, the fact that *National Woodwork* and *Houston* were decided after the National Labor Relations Board conducted an evidentiary hearing does not necessarily impel a hearing in a suit for damages, absent allegations of fact which would support a finding that *"in fact* the activity directed against (the primary employer) * * * was carried on for its effect *elsewhere."* 386 U.S., l. c. 632, 87 S.Ct. 1262. A hearing upon the merits under the allegations of the Amended Complaint, could result only in disclosing a difference of opinion as to the *desirability* of Article 5(b).

A careful reading of the Amended Complaint as well as the memoranda filed in support thereof, discloses that in spite of their broad-brush approach, plaintiffs do not seriously question that Local Union may legitimately insist upon a provision in a collective bargaining agreement which preserves for its members the right to cut, weigh, slice and wrap on plaintiffs' premises all those products which traditionally have been so handled. Nor is any complaint at all made concerning the legitimacy of the first sentence of Article 5(b) providing that the member employees shall "handle" all fresh, frozen and smoked meat, sausage, poultry, rabbits, fish and seafood.

What plaintiffs really argue is simply that conditions in the food industry have so changed since 1950, when Article 5(b) was first inserted in the agreements, that the language there employed, if literally applied, is so broad as to prohibit the handling of other meat products which, so it is alleged, could not feasibly or economically be cut, weighed, sliced and wrapped on the premises. Attached to the Amended Complaint is a list of various products which plaintiffs assert they are precluded from selling because

of the language of Article 5(b). Included in these products are such items as calf livers, sliced beef liver, "various sizes" veal cutlets, and "various sizes" veal leg roast, presumably because they are packaged under a "brand name."

In this connection we again note plaintiffs' allegations that the Unions have "arbitrarily and selectively" allowed certain of plaintiffs' stores to sell "certain" (undesignated) meat and meat products which, technically, plaintiffs were forbidden to sell by Article 5(b), as well as their allegation that an officer of Local Union actively encouraged plaintiffs to overlook Article 5(b) in some instances. In making these vague allegations as to the application and interpretation of Article 5(b), plaintiffs necessarily are asking this Court to interpret and construe the language of Article 5(b) just as plaintiffs themselves have done in submitting the list of products which they contend Article 5(b) prevents them from offering for sale to the general public.

We note that the bargaining agreements contain a grievance clause providing for arbitration, when other steps fail to settle the matter, "if any differences, disputes or complaints arise over the *interpretation or application*" of the agreements. Whether Article 5 (b) should be interpreted as applying to those prepackaged meats or meat products which could not feasibly or economically be packaged on the premises, and even whether it actually applies to and prevents plaintiffs from selling all of the products listed on the exhibit attached to the Amended Complaint are matters that should in any event have been initially resolved by arbitration before plaintiffs filed this action. We believe that at the very least it would be inappropriate for this Court to make a determination of matters which are or may be properly for arbitration.

The separate motions of defendants to dismiss should be and are hereby sustained.